**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

United States of America,                    Case No. 22-cr-124(2) (NEB/TNL)

               Plaintiff,

v.                                           **REPORT & RECOMMENDATION**

Mohamed Jama Ismail,

               Defendant.

Chelsea A. Walcker, Craig R. Baune, Harry Jacobs, Joseph H. Thompson, and Matthew S. Ebert, Assistant United States Attorneys, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for the Government); and

Patrick L. Cotter, Sieben & Cotter, PLLC, 105 Hardman Court, Suite 110, South Saint Paul, MN 55075 (for Defendant).

## I. INTRODUCTION

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant Mohamed Jama Ismail's Pretrial Motion for Suppression of Statement, ECF No. 250. This motion has been referred to the undersigned for a report and recommendation to the district court, the Honorable Nancy E. Brasel, District Judge of the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

A hearing was held on August 21, 2023. ECF No. 290. Matthew S. Ebert and Harry Jacobs appeared on behalf of the United States of America (the "Government")

and Patrick L. Cotter appeared on behalf of Defendant.  Post-hearing briefing is now complete, and this motion is ripe for a determination by the Court.

## II. FINDINGS

The Court heard testimony from Postal Inspector Peter Holt with the United States Postal Inspection Service.  The Government offered and the Court received Government Exhibit B, an audio recording of the January 20, 2022 interview at issue.  Tr. 95:25-96:6, ECF No. 293; *see generally* Gov't Ex. B.

Postal Inspector Holt has been a federal agent for almost twenty years, and has been with the United States Postal Inspection Service since 2008.  Tr. 97:1-2.  As a postal inspector, Postal Inspector Holt investigates "federal crimes associated with the postal service."  Tr. 96:15-19.  In his capacity as a federal agent, Postal Inspector Holt has received training on the safe execution of search warrants and "conducting interviews of targets and subjects of investigations," among other things.  Tr. 97:8-98:5.  Postal Inspector Holt estimated that he has executed "[d]ozens" of search warrants and conducted "dozens, if not into hundreds" of interviews of individuals who are targets or subjects of an investigation.  Tr. 97:16-21.

Postal Inspector Holt was not a case agent in connection with this investigation. Tr. 98:11-12.  Postal Inspector Holt's role was to assist with the execution of the search warrant on January 20 and interview Defendant.  Tr. 98:8-9, 17-23.  Postal Inspector Holt explained that a search warrant is typically executed with agents "lining up at the front door" in a "stack," "knocking and announcing their presence," and "identifying that they have a search warrant."  Tr. 99:12-15; *see* Tr. 100:7-9 ("[W]e call it a stack, where you

have a group of – or a line of agents."). When the door is answered, "normally that individual is brought outside" while the search warrant is "be[ing] executed on the inside." Tr. 99:15-19. Postal Inspector Holt testified that with "any search warrant[,] the last place you want to stop would be in a doorway," so the individual who answers the door is "passed" down the line of agents, being "[h]anded from agent to agent," so that "agents are then able to enter the home and execute the search warrant safely." Tr. 100:6-14; *see* Tr. 135:6-13. Postal Inspector Holt testified that it was standard for the individual to be "handcuffed or secured [at the outset] just for officer safety reasons, and that's explained to the individual, just temporarily while they're able to execute the search warrant, and when things calm down, normally those handcuffs or restraints are released." Tr. 101:17-21. Postal Inspector Holt testified that, while a search warrant is being executed, individuals "are typically not allowed back inside." Tr. 103:4-8. Postal Inspector Holt testified that "[i]f they need something, if a request is made for a drink, for an item of clothing or something like this, then we'll be happy to go get it and provide it to them." Tr. 103:8-10.

Postal Inspector Holt testified that interviews conducted along with the execution of a search warrant generally involve two agents being partnered together; the agents identify themselves and talk with the individual, asking "if they're willing to speak with you that day"; and, if the individual is willing to do so, the agents "document the interview via recording." Tr. 98:24-99:5. Postal Inspector Holt testified that if the "individual doesn't want to talk, . . . then all interview is concluded." Tr. 99:5-6.

On January 20, a search warrant was executed on Defendant's home around 7:00

a.m.  Tr. 99:20-24; *see* Tr. 100:24 ("It was early morning."); *see also* Tr. 117:3-6, 120:8-10.  Postal Inspector Holt testified that there were "[a] good amount" of law enforcement agents involved, giving varying estimates between "definitely more than five, probably less than 20" and "10, 15."  Tr. 99:7-10, 113:7-12, 117:15-20.  Postal Inspector Holt testified that the agents met in a park to "consolidate[] vehicles" before going to Defendant's home, and estimated there were "three or four" unmarked law enforcement vehicles at Defendant's home.  Tr. 113:18-25; *see* Tr. 114:1-6.  Postal Inspector Holt testified that there may have been additional marked, local law enforcement vehicles down the street.  Tr. 114:7-17, 115:8-24.  Postal Inspector Holt testified that he believed the agents involved in the execution of the search warrant all had firearms.  Tr. 115:25-116:7.  Postal Inspector Holt further testified that, while the agents were most likely dressed in plainclothes, they would have been "wearing a tactical vest."  Tr. 116:11-17.  Postal Inspector Holt testified that it was possible some of the agents were "wearing tactical headgear," but he did not recall if any in fact were.  Tr. 116:23-117:2.  Postal Inspector Holt testified that "it was exceptionally cold that day" and the temperature "was below zero."  Tr. 100:15-22; *see* Tr. 101:13, 120:3-7.

Postal Inspector Holt testified that "[i]t took a little bit of time" for Defendant to answer the door.  Tr. 99:25-100:3; *see* Tr. 117:21-23, 137:6-8.  Postal Inspector Holt could not specifically recall what Defendant was wearing when he answered the door, but testified "it was some sort of, like, pajama."  Tr. 100:23-101:5; *see* Tr. 117:24-118:10; *see also* Tr. 135:22-24.  Postal Inspector Holt could not recall whether Defendant was wearing any shoes.  Tr. 102:12-15; *see* Tr. 118:19-20, 120:18-24, 131:15-132:1; *see also*

4

Tr. 135:22-24. Postal Inspector Holt could not recall whether Defendant was wearing a shirt when he answered the door, but to "the best of [his] recollection, [Defendant] had one in the [vehicle]." Tr. 118:15-18, 119:14-20; *see* Tr. 135:22-24.

Once Defendant was passed down the line of agents and handcuffed, he was placed into a warm law enforcement SUV nearby. Tr. 102:8-11, 16-19; *see* Tr. 103:14-17 ("[T]he engine had been running, the interior was warm."); *see also* Tr. 119:2-3, 135:20-21. Postal Inspector Holt estimated that it was "minutes" between when Defendant "stepped out of the house" until he was placed in the warm vehicle. Tr. 103:11-13; *see* Tr. 127:2-6, 136:3-10.

Defendant was placed in the back seat of the vehicle, next to a door. Tr. 104:12-16. Postal Inspector Holt testified that there were two agents present in the vehicle, himself and one other agent. Tr. 104:5-6; *see* Gov't Ex. B at 00:22-51 (two agents identifying themselves); *see also* Tr. 122:9-13. Postal Inspector Holt testified that the other agent was seated in the driver seat. Tr. 104:10-11. Postal Inspector Holt could not recall if he was sitting in the front passenger seat or in the back seat with Defendant. Tr. 104:7-9; *see* Tr. 127:17-20. Once Defendant was in the vehicle, the handcuffs were removed. Tr. 104:17-21, 110:11-14; *see* Tr. 122:14-16. The vehicle's doors were not locked. Tr. 110:11-14, Tr. 127:14-16. Defendant was not placed under arrest. Tr. 104:22-23.

Postal Inspector Holt testified that it was explained to Defendant that law enforcement was executing a search warrant on his home, he was not under arrest, and he was free to leave. Tr. 105:19-106:1. The interview was recorded. Tr. 105:3-4; *see*

5

*generally* Gov't Ex. B.  In the beginning, the other agent told defendant that "we're going to cover a few things just to let you know, you've already heard it, but just tell you again so you're absolutely clear."  Gov't Ex. B at 00:21-29.  The other agent identified himself and stated that he was assisting with a "criminal investigation."  Gov't Ex. B at 00:29-37. Postal Inspector Holt then identified himself.  Gov't Ex. B at 00:37-51.  The other agent then proceeded to tell Defendant:

> Just to reiterate.  You're not under arrest today.  Umm, we're asking to [sic] you to speak with us voluntarily.  It's your choice.  You can leave at any time.  You can stop at any time. But, this is an opportunity, uhh, for you to clarify some stuff for us in the investigation.

Gov't Ex. B at 00:52-1:10; *see* Tr. 111:17-25.  Defendant said "okay," and Postal Inspector Holt then asked, "with that in mind, uhh, do you mind speaking to us?"  Gov't Ex. B at 1:10-16.  Defendant responded, "yeah, I don't mind" and that he had "nothing to hide."  Gov't Ex. B at 1:17-20.

The interview began at approximately 7:35 a.m.  Gov't Ex. B at 1:39-48.  Postal Inspector Holt acknowledged that the purpose of the interview was "to gather evidence." Tr. 124:6-125:1; *see* Tr. 125:14-17.  About an hour into the interview, Defendant told the agents "you ask a lot of questions."  Gov't Ex. B at 1:05:48-50.  After a few more questions, Defendant asked, "Do I need, uhh uhh, a lawyer for this?  I mean like a . . . ." Gov't Ex. B at 1:07:32-35; *see* Tr. 105:9-12.  The other agent responded, "We can't really provide any advice about lawyers.  Your—your decision."  Gov't Ex. B at 1:07:35-41; *see* Tr. 105:9-12, 108:4-8, 130:5-15, 131:3-12.  Postal Inspector Holt added, "You're, you're talking to us freely so . . . ."  Gov't Ex. B at 1:07:41-43.

Defendant responded "yeah, I know, but . . . ." and proceeded to express concern over the amount of questions. Gov't Ex. B at 1:07:44-56. Defendant reiterated that he wanted to tell the agents what he knows and that he had nothing to hide, but was concerned about answering questions about things he did not know for sure and whether he should have a lawyer. Gov't Ex. B at 1:07:57-1:08:18. The other agent told Defendant that he did not understand the question. Gov't Ex. B at 1:08:19-21. Defendant again stated that he was concerned about the detail of the questions and things he did not know. Gov't Ex. B at 1:08:21-36. The other agent told Defendant that "as long as you're telling us the truth, if you say you don't know, then you don't know." Gov't Ex. B at 1:08:36-41.

The interview was then interrupted by a third agent who needed some information from Defendant to access certain things in his home. Gov't Ex. B at 1:08:41-1:10:52. After the third agent left, Defendant again stated that he was not hiding anything and clarified that the agents were trying to get more information about him. Gov't Ex. B at 1:10:54-1:11:05. The other agent confirmed that they were asking Defendant questions about his business. Gov't Ex. B at 1:11:06-07. Defendant confirmed that he knew that, and stated there were some things he did not know about the business and he was concerned about answering questions to which he did not fully know the answer. Gov't Ex. B at 1:11:08-34. The other agent confirmed that they also did not want Defendant to provide information that he did not know and only wanted him to provide the information that he did know. Gov't Ex. B at 1:11:35-41. Defendant responded, "Okay, okay, sounds good, yeah." Gov't Ex. B at 1:11:42-43.

7

The interview continued for approximately another hour.  *See generally* Gov't Ex.

B.  At one point, Defendant asked the agents if it was okay if he opened the door to spit

and was able to do so.  Gov't Ex. B at 1:40:32-45.  At the end of the interview, Postal

Inspector Holt told Defendant that

> they are just about done inside.  Umm, they wanted to tell you
> that, uhh, as of now, you are certainly free to go again.  Umm,
> you can, if you wanted to go someplace, you can take the
> Cadillac.  Umm, but you know, it's up to you.  Uhh, until
> they decide to leave, you should probably hang out with us if
> you don't want to go anywhere.

Gov't Ex. B at 2:10:01-22; *see* Tr. 106:11-15, 108:18-109:17, 129:6-130:1.  Defendant

stated that he needed to take a shower and Postal Inspector Holt told him that the search

would "be done shortly and then you can go back in and you can take your shower and

get ready to go."  Gov't Ex. B at 2:10:23-37.  Defendant remained with Postal Inspector

Holt and the other agent in the vehicle until the search was complete.  Tr. 109:23-110:5.

Postal Inspector Holt testified that the interview was "very conversational."  Tr.

105:13-15.  Postal Inspector Holt testified that Defendant's demeanor was "very

comfortable, very relaxed" and he "never complained about anything."  Tr. 107:8-11; *see*

Tr. 107:17-18 (did not "seem upset or angry").  Postal Inspector Holt testified that

Defendant was "slightly" nervous, but no more so than other individuals speaking with

law enforcement that Postal Inspector Holt had encountered.  Tr. 107:12-16.  Postal

Inspector Holt also testified that there did not appear to be any communication

difficulties.  Tr. 107:19-24.  Postal Inspector Holt testified that Defendant voluntarily

agreed to respond to their questions and at no point did Defendant object or ask to leave.

Tr. 110:15-21.

Postal Inspector Holt testified that "[t]hroughout the whole time, we had asked if he needed anything and that, if you know, he needed something that we were more than willing to get items for him." Tr. 109:18-22. To the extent Postal Inspector Holt, the other agent, or any of the additional agents participating the execution of the search warrant asked Defendant whether he needed anything and offered to get things for him from his home, no such inquiries or offers were captured on the audio recording. Postal Inspector Holt did not recall going into Defendant's home to get any additional clothing for Defendant, and testified that "[a]t no point did [Defendant] request any." Tr. 126:16-22. On cross examination, Postal Inspector Holt was asked if he recalled getting a blanket to put around Defendant. Tr. 122:14-123:2. Postal Inspector Holt could not recall. Tr. 122:21-123:2. Postal Inspector Holt could not recall if he was the agent that escorted Defendant to the vehicle and did not know who in fact had done so. Tr. 134:4-12.

Postal Inspector Holt testified that if Defendant "wanted to [just jump out of the vehicle]" and leave, "he could have." Tr. 127:21-24. Postal Inspector Holt testified that law enforcement would not have stopped him. Tr. 127:21-128:5. Postal Inspector Holt testified that typically agents will have their service weapons drawn "as entry is made," but no service weapons were drawn during the interview. Tr. 136:14-137:1.

### III. CONCLUSIONS OF LAW

Based upon the foregoing findings, the undersigned Magistrate Judge makes the following conclusions of law.

"The Fifth Amendment provides that no person 'shall be compelled in any criminal case to be a witness against himself.'"  *United States v. LeBrun*, 363 F.3d 715, 719-20 (8th Cir. 2004) (quoting U.S. Const. amend. V).  Defendant moves to suppress the statements he made to law enforcement on January 20, arguing the agents subjected him to a custodial interrogation without a *Miranda* warning.[1]  Defendant also asserts that his statements were made involuntarily.  The Government contends that the interview was non-custodial and Defendant's statements were voluntary.

### A. Whether the Interview was Custodial

 "The Fifth Amendment requires that *Miranda* warnings be given when a person is interrogated by law enforcement after being taken into custody."  *United States v. Smialek*, 970 F.3d 1070, 1074 (8th Cir. 2020); *accord United States v. Chipps*, 410 F.3d 438, 445 (8th Cir. 2005); *see also Rhode Island v. Innis*, 446 U.S. 291, 297-98 (1980); *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  There appears to be no dispute that the January 20 interview was an interrogation.  *See generally* ECF No. 311 at 4-6 (arguing only that interview was non-custodial); *see also* ECF No. 278 at 53-56 (same).

"A person is considered to be in custody for the purposes of *Miranda* warnings when there is a formal arrest or restraint on his or her freedom of movement of the degree associated with formal arrest."  *United States v. Sandell*, 27 F.4th 625, 628-29 (8th Cir. 2022) (quotation omitted); *see also, e.g.*, *United States v. Simpson*, 44 F.4th 1093, 1096 (8th Cir. 2022); *United States v. Williams*, 760 F.3d 811, 814 (8th Cir. 2014); *United*

---

[1] Although Defendant's motion refers to a "post-Mirandized statement," ECF No. 250 at 1; *see also* ECF No. 251 at 1, 2, Defendant clarified at the hearing and in subsequent briefing that the statements at issue were in fact "un[-]Mirandized," not "post-Mirandized," Tr. 82:19-25; *see generally* ECF No. 280, 301.

*States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004).  "Whether the interrogation was custodial depends on whether a reasonable person in the defendant's shoes would have felt free to end the interview."  *United States v. Johnson*, 39 F.4th 1047, 1050 (8th Cir. 2022) (quotation omitted); *see also, e.g.*, *Simpson*, 44 F.4th at 1096; *Sandell*, 27 F.4th at 629; *Williams*, 706 F.3d at 814; *cf. Czichray*, 378 F.3d at 826 ("'only relevant inquiry' . . . is how a reasonable person in [the defendant's] position would have understood his situation" (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984))).

Courts "look to the totality of the circumstances to determine whether a reasonable person would have felt free to end the interview."  *Johnson*, 39 F.4th at 1051; *see also, e.g.*, *Sandell*, 27 F.4th at 629; *Williams*, 760 F.3d at 814; *Czichray*, 378 F.3d at 826.  In *United States v. Griffin*, the Eighth Circuit set out six non-exhaustive factors for courts to consider when determining whether an individual was in custody at the time of questioning:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

922 F.2d 1343, 1349 (8th Cir. 1990); *see also, e.g.*, *Sandell*, 27 F.4th at 629.  "The first three indicia are mitigating factors which, if present, mitigate against the existence of

custody at the time of questioning.  Conversely, the last three indicia are aggravating factors which, if present, aggravate the existence of custody." *United States v. Axsom*, 289 F.3d 496, 501 (8th Cir. 2002); *see also Czichray*, 378 F.3d at 827.

Importantly, whether someone is in custody "cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." *Czichray*, 378 F.3d at 827.  The *Griffin* factors are "simply a rubric for considering the ultimate issue, not a mandatory checklist[.]" *United States v. Perrin*, 659 F.3d 718, 720 (8th Cir. 2011).  In the end, "[t]he ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest." *Czichray*, 378 F.3d at 828.

Defendant acknowledges that the agents advised him that he was not under arrest, his decision to speak with them was voluntary, and he could leave at any time. Defendant asserts, however, that the combined circumstances of the law-enforcement dominated atmosphere in the execution the search warrant, being handcuffed, and being removed from his home in the early morning of a bitterly cold winter day without proper attire restricted his freedom of movement to the degree associated with formal arrest. Defendant asserts that "[h]e was without proper clothing, he did not have his car keys, and he could not go into his home to gather his items." ECF No. 301 at 5.  According to Defendant, "[h]is only option was to terminate the encounter and walk down the snowy street in his skivvies," ECF No. 301 at 5, and "it would be unreasonable to expect any reasonable person to do anything but acquiesce to police questioning," ECF No. 301 at 6.

The Government emphasizes that Defendant was advised he was not under arrest,

he did not have to talk with the agents, and he was free to leave at any time. The Government points out that Defendant was not handcuffed during the interview, there were only two agents present during the interview, and neither agent raised his voice or threatened Defendant. The Government also points out that Defendant elected to remain in the vehicle with the agents following the interview until the search was completed. After careful review, the Court concludes that Defendant was not in custody when he was interviewed on January 20.

Beginning with the first factor, it is undisputed that Defendant was informed at the outset that he was not under arrest, speaking with the agents was voluntary, and he could leave at any time. "The most obvious and effective means of demonstrating that a suspect has not been taken into custody is for police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." *Williams*, 760 F.3d at 815 (quotation omitted); *see also, e.g.*, *United States v. Duggar*, 76 F.4th 788, 793 (8th Cir. 2023); *Sandell*, 27 F.4th at 629; *Czichray*, 378 F.3d at 826; *Griffin*, 922 F.2d at 1349-50. "Advice that a suspect is not under arrest, and that his participation in questioning is voluntary, is highly probative of whether a reasonable person would feel that he may terminate the interview and leave." *Williams*, 760 F.3d at 815. This factor weighs heavily in the Court's analysis. *See Duggar*, 76 F.4th at 793; *Czichray*, 378 F.3d at 826.

As for the second factor and whether Defendant possessed unrestrained freedom of movement during the questioning, Defendant emphasizes that he was "handcuffed, escorted to a law enforcement vehicle while in his underwear and with nothing on his

feet."  ECF No. 280 at 3; *see also* ECF No. 301 at 4 ("[L]aw enforcement handcuffed and forcibly removed a barely dressed [Defendant] and shuffled him to the back seat of a police SUV.  It was -9 degrees below zero, and [Defendant] was barefoot.").  While Defendant was handcuffed initially for officer safety and escorted to the vehicle, the handcuffs were removed once he was placed in the unlocked vehicle, mere "minutes" later.  *See United States v. Sanchez*, 676 F.3d 627, 631 (8th Cir. 2012).  The doors to the vehicle were unlocked.  *See Duggar*, 76 F.4th at 794; *Johnson*, 39 F.4th at 1051.

Defendant's state of (un)dress is a closer question.  It is undisputed that the execution of the search warrant occurred on a cold winter morning in Minnesota.  Postal Inspector Holt could not recall what Defendant was wearing at the time.  The recording received as Government Exhibit B does not include audio of the agents informing Defendant that they would retrieve items from his home if he needed them.  On the other hand, the handcuffs were removed quickly.  *Contra United States v. Flowers*, Case Nos. 3:16-cr-00035-SLG-SAO, 3:16-cr-00058-SLG-SAO, 2016 WL 8679286, at *5 & n.34 (D. Alaska Sept. 23, 2016) (no dispute defendant was in custody where defendant remained in handcuffs, his movement was "subject to the permission" of law enforcement, and "he remained partially clothed, until officers obtained clothes and shoes for him"), *report and recommendation accepted*, 2016 WL 6471581 (D. Alaska Oct. 31, 2016).

Ultimately, the Court cannot determine whether Defendant possessed "unrestrained freedom of movement during questioning" by the agents because he did not attempt to move about.  *See Sanchez*, 676 F.3d at 631 (finding the second *Griffin* factor

difficult to determine where the defendant did not attempt to leave because "it is unclear what would have happened if she had"). He never told the agents he wanted leave. *See United States v. Hoeffener*, 950 F.3d 1037, 1046 (8th Cir. 2020) ("At no time did [the defendant] ask to get out of the vehicle."); *see also United States v. Brown*, 441 F.3d 1330, 1349 (11th Cir. 2006). Similarly, appreciating Defendant's state of (un)dress, Defendant "never exercised the most basic method at his disposal for avoiding discussions with police—simply not talking to them." *Brown*, 441 F.3d at 1349; *see Czichray*, 378 F.3d at 828 ("Assuming a reasonable person in Czichray's position would feel that he was not free to use the telephone during the questioning, he still retained two viable options: conduct an uninterrupted interview with the agents or terminate the interview."). At bottom, this factor weighs slightly in favor of a finding that Defendant was not in custody.

With respect to the third factor, although the agents initiated the counter, Defendant "voluntarily acquiesced to official requests to respond to questions." *Sandell*, 27 F.4th at 630. Defendant was friendly and cooperative throughout the interview. For the most part, he sounded generally at ease and the conversation was largely free-flowing with Defendant providing detailed answers to the agents' questions. *See Axsom*, 289 F.3d at 501-02; *United States v. Skog*, No. 18-cr-085 (WMW/HB), 2018 WL 4938718, at *7 (D. Minn. Aug. 28, 2018) ("Skog was friendly and cooperative throughout the interview, and did not hesitate to answer questions about his business or the numismatic coin industry. He did not exhibit any verbal or audible signs of stress in responding to questions, or reticence to answer the questions he was asked."), *report and*

*recommendation adopted*, 2018 WL 4932866 (D. Minn. Oct. 11, 2018).   Nor did Defendant indicate at any point that he wanted to terminate the interview.  *See Czichray*, 378 F.3d at 828-29; *Skog*, 2018 WL 4938718, at *7; *cf. Brown*, 441 F.3d at 1349.

Turning to the fourth factor, strong-arm tactics include situations where police "adopt a threatening posture toward [the suspect], display their weapons, or make a physical show of force during questioning."  *Skog*, 2018 WL 4938718, at *7 (quoting *Axsom*, 289 F.3d at 502).   Strong-arm tactics and deceptive stratagems also include "confronting suspects with false or misleading witness statements, repeatedly lying to the suspect, or employing a good cop-bad cop routine."  *Id*. (citing *United States v. Peterson*, No. 14-cr-328 (JRT/FLN), 2015 WL 1585507, at *7 (D. Minn. Apr. 2, 2015)).   Police tactics are less likely to be considered strong-arm where police ask "straightforward questions" that elicit "straightforward answers."  *See id*. (citing *Axsom*, 289 F.3d at 502). Defendant has not argued that the agents used strong-arm tactics or deception during the interview and the Court did not perceive any on the recording.

As to the fifth factor, Defendant asserts that the atmosphere was police-dominated, pointing out that agents came to his door with "[g]uns drawn, draped in tactical gear," ECF No. 301 at 4, and "were searching through his residence," preventing him from "return[ing] to his residence," ECF No. 301 at 5.  "Any warrant search is inherently police dominated; there is nothing untoward about that circumstance."  *Perrin*, 659 F.3d at 721; *accord Williams*, 760 F.3d at 815.  "Police inevitably 'dominate' the atmosphere in some sense while they are conducting a search."  *Williams*, 760 F.3d at 815. "Searching investigators typically come armed and in groups of sufficient number to

ensure officer safety." *Id.* Having a group of sufficient numbers would also tend to deter any contemplated resistance that may transform a search into a violent confrontation. As in *Williams*, "[t]o accept [Defendant's] contention here would come close to mandating that *Miranda* warnings accompany any questioning conducted during execution of a search warrant. But *Miranda* applies only when the circumstances approximate a formal arrest, and execution of a search warrant is not an arrest." *Id.* Moreover, while there may have been several more agents involved in the execution of the search warrant, only two agents interviewed Defendant. *See Axsom*, 289 F.3d at 502.

And, as for the sixth and final factor, there is no dispute that Defendant was not placed under arrest at the end of the interview.

Under the totality of the circumstances, the Court concludes "that a reasonable person in [Defendant's] position would have felt free to end the interview." *Sanchez*, 676 F.3d at 632; *see also Duggar*, 76 F.4th at 794. Absent any indication that Defendant in fact attempted to leave or terminate the interview and was prevented from doing so, or was repeatedly denied requested items of clothing, footwear, and/or outerwear so as to facilitate any such departure and/or termination, Defendant's state of (un)dress alone did not transform this otherwise non-custodial setting into a custodial one. The Court concludes that Defendant was not in custody during the January 20 interview, and therefore no *Miranda* warnings were required.

## B. Whether Defendant's Statements Were Voluntary

Lastly, Defendant argues that his statements were the product of "physical and psychological pressures" and therefore involuntary. ECF No. 301 at 7.

"A statement made outside of a custodial interrogation may be suppressed if it is not made voluntarily." *United States v. Mattox*, 27 F.4th 668, 674 (8th Cir. 2022). "Statements to law enforcement authorities are voluntary if they are the product of an essentially free and unconstrained choice by their maker." *United States v. Ferguson*, 970 F.3d 895, 902 (8th Cir. 2020) (quotation omitted). "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *LeBrun*, 363 F.3d at 724 (quotation omitted); *accord Mattox*, 27 F.4th at 675; *Sandell*, 27 F.4th at 630; *United States v. Magallon*, 984 F.3d 123, 1284 (8th Cir. 2021). "[C]oercive police activity is a necessary predicate to finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." *Williams*, 760 F.3d at 816 (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). "A statement is not considered involuntary unless the police extorted it from the accused by means of coercive activity." *Id.* (quotation omitted); *accord Ferguson*, 970 F.3d at 902; *see also United States v. Monteer*, 83 F.4th 1119, 1123 (8th Cir. 2023).

Courts "determine if a defendant's will has been overborne by examining the totality of the circumstances, including both the conduct of law enforcement in exerting pressure to confess on the defendant and the defendant's ability to resist that pressure." *Magallon*, 984 F.3d at 1284 (quotation omitted); *accord Mattox*, 27 F.4th at 675; *Sandell*, 27 F.4th at 630; *see also, e.g., LeBrun*, 363 F.3d at 724 ("The court must look at the conduct of the officers and the characteristics of the accused." (quotation omitted)). "Factors include the degree of police coercion, the length of the interrogation, its

18

location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." *Magallon*, 984 F.3d at 1284 (quotation omitted); *accord Sandell*, 27 F.4th at 630.

"The government bears the burden of persuasion and must prove by a preponderance of the evidence that the challenged statements were voluntary." *LeBrun*, 363 F.3d at 724; *accord Mattox*, 27 F.4th at 675. "Whatever the facts of an individual case, [the court's] polestar always must be to determine whether or not the authorities overbore the defendant's will and critically impaired his capacity for self-determination." *LeBrun*, 363 F.3d at 725. "This is a very demanding standard . . . ." *Id.* at 726.

In maintaining that Defendant's statements were voluntary, the Government points out that Defendant "was not shouted at or physically threatened"; "[n]o coercive tactics were used"; and "[n]o threats were made." ECF No. 311 at 6. The Government additionally points out that "[t]he tone of the interview was cordial throughout," and "[t]he agents were consistently forthright, explaining why they wanted to speak with [Defendant], never lied to him, and did not make any promises." ECF No. 311 at 6. The Court's own review of the audio recording confirms that no threats or promises were made by the agents to Defendant and they did not raise their voices. The Court agrees that the tone of the interview was cordial and the agents were polite and professional.

Defendant argues that the circumstances leading to his placement in the vehicle and his state of (un)dress exerted pressure on him. He also argues that English is his second language. Again, there is no indication that Defendant in fact attempted to leave or terminate the interview and was prevented from doing so, or was repeatedly denied

requested items of clothing, footwear, and/or outerwear so as to facilitate any such departure and/or termination. Defendant also did not appear to have trouble understanding the agents or communicating with them. He gave detailed and involved answers to their questions.

Defendant also argues that "[t]he fact that he asked twice if he needed a lawyer shows that he did not understand his legal rights," and "law enforcement avoid[ed] answering, stating that he was making the statement freely, and they could not advise him on the issue." ECF No. 301 at 7-8. "Merely asking the interviewing officers whether one should have an attorney present . . . is not an unambiguous and unequivocal request for legal representation." *United States v. Mays*, 683 F. App'x 427, 433 (6th Cir. 2017); *see United States v. Havlik*, 710 F.3d 818, 821-22 (8th Cir. 2013); *see also Davis v. United States*, 512 U.S. 452, 459 (1994) ("[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning."). The agents responded that they could not give Defendant advice on whether he needed a lawyer and that it was his decision. The agents also reminded Defendant that it was his decision to speak with them. Nothing about their "responses suggest[s] that [the agents] were improperly pressuring [Defendant] to continue with the [interview]." *Mays*, 683 F. App'x at 433. Nor did Defendant indicate an unwillingness to continue speaking with them. *See United States v. Freeman*, No. 10-cr-68 (JRT/LIB), 2010 WL 4386894, at *8 (D. Minn. Oct. 28, 2010).

In sum, the Court concludes the Government has met its burden to prove that Defendant's statements on January 20 were voluntarily made.

## IV. RECOMMENDATION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's Pretrial Motion for Suppression of Statement, ECF No. 250, be **DENIED**.


Date: December  19 , 2023                         *s/ Tony N. Leung*
                                                  Tony N. Leung
                                                  United States Magistrate Judge
                                                  District of Minnesota

                                                  *United States v. Ismail*
                                                  Case No. 22-cr-124(2) (NEB/TNL)


## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:**  This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.