# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA
Criminal No. CR 22-124(2) (NEB)

————————————————————————

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **DEFENDANT'S POSITION** |
| vs. | ) | **REGARDING SENTENCING** |
| | ) | |
| Mohamed Jama Ismail, | ) | |
| | ) | |
| Defendant. | ) | |

————————————————————————

The Defendant, by and through his attorney, Patrick L. Cotter, and pursuant to U.S.S.G. § 6A1.2, and Local Rule 83.10, respectfully submits the following position regarding sentencing in this matter.

## INTRODUCTION

Mohamed Ismail, through counsel, respectfully offers the following position on sentencing. After careful consideration of all of the 18 U.S.C. § 3553(a) factors, to include Mr. Ismail's more limited role in the offense conduct and individual characteristics, a 24-36 month term of imprisonment is sufficient, but not greater than necessary to accomplish the goals of sentencing.

Mr. Ismail moves the Court to apply a wholistic and fair application of the loss amount relative to Mr. Ismail's offense conduct. Mr. Ismail moves the Court to consider his remarkable individualized characteristics as a refugee from Somalia who through resilience and determination built a successful life as a hard-working employee, accomplished business owner, positive contributor to his community, husband, and father.

Mr. Ismail moves the court to consider the 10 ½ months of total incarceration he has served at the Sherburne County jail prior to sentencing and the remainder of the 2 and ½ years on strict supervise release with GPS monitoring and home confinement restrictions. Mr. Ismail moves the Court for a downward variance to a sentence of a term of imprisonment of no greater than 24-36 months.

## I.     MR. ISMAIL'S OBJECTIONS TO THE PRESENTENCE REPORT

The crux of the issue with the Presentence Investigation Report is that it fails to accurately distinguish Mr. Ismail's role from the vast fraud propagated across many different, and unconnected groups. This starts with the broad inclusion of what probation considers "related cases" in the PSR. PSR ¶¶ 6-25. The only cited connection between the cases is a general investigation into fraud involving Federal Child Nutrition Programs and claims submitted through Feeding our Future and Partners in Quality Care, yet there is no direct link to Mr. Ismail or his specific actions. This approach unfairly associates him with 70 other defendants charged in the same broad investigation, which could adversely affect his sentence, and reputation and treatment in the Bureau of Prisons. Even though the amendment to the PSR states that those paragraphs do not allege that Mr. Ismail was involved in the unrelated conduct, such sweeping categorization is inappropriate, as it misrepresents Mr. Ismail's actual role in the offense and creates a misleading narrative that conflates his conduct with that of numerous others. PSR Amendments, ¶ 1.

### A.     Mr. Ismail maintains he should be considered a minor participant in the conspiracy.

2

Mr. Ismail maintains his position that he is eligible for a minor role reduction. A defendant is entitled to a 2-level decrease in their base offense level if they were a minor participant in the offense. U.S.S.G. §3B1.2. For the adjustment to apply, the Court must find that Mr. Ismail was "substantially less culpable than the average participant[.]" *United States v. Jones*, 25 F.4th 1077, 1080 (8th Cir. 2022). In determining whether a person is substantially less culpable, "[t]he district court should consider … the defendant's knowledge, planning, authority, responsibility, and benefit from the illegal scheme." *Id* at 1079 (citations omitted); *see also* § 3B1.2 cmt. n.3(C). The analysis should also include "measuring each participants individual acts and relative culpability against the elements of the offense." *United States v. Snoddy*, 139 F.3d 1224, 1228 (8th Cir. 1998) (citing *United States v. Goebel*, 898 F.2d 675, 677 (8th Cir. 1990)).

Application Note 3(C) to §3B1.2 provides a non-exhaustive list of factors for the court to consider in determining whether to apply a mitigating role adjustment and, if so, the amount of the adjustment: (i) the degree to which the defendant understood the scope and structure of the criminal activity; (ii) the degree to which the defendant participated in planning or organizing the criminal activity; (iii) the degree to which the defendant exercised decision making authority or influenced the exercise of decision-making authority; (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; [and] (v) the degree to which the defendant stood to benefit from the criminal activity

Mr. Ismail asserts the facts presented at trial show he did not have a full knowledge of the scope and structure of the criminal activity.   Mr. Abdiaziz Farah controlled all bank accounts, conducted all communications with Feeding or Future and Partners in Nutrition, and set up a separate company Empire Enterprises that Ismail was not aware of to submit claims.  Mr. Abdiaziz Farah planned and organized the criminal activity along with other co-conspirators, and had full decision-making authority.

Mr. Ismail participation was more limited.  Mr. Ismail primarily handled day to day operations of the Empire Cuisine and Market store and restaurant.  Mr. Ismail also signed meal count sheets at the SouthCross site and a few others.  However, Agent Pitzen who analyzed Mr. Ismails electronic devices, testified that the vast majority of Ismail's communications involved day to day operations of the Market and Restaurant.  Further, the substantive count of Wire Fraud that involved Mr. Ismail's direct involvement with meals claimed early on is the Count he was acquitted.  The factor that cuts most significantly against Mr. Ismail's position that he played a minor role is that he did personally benefit from the criminal activity. However, in total the greater weight of the factors supports Mr. Ismail's position that he was a minor participant.

### B.      The obstruction of justice enhancement should not apply

Probation contends that that Mr. Ismail obstructed justice when he obtained a passport with a false statement. Probation's argument hinges on the fact that obstructive conduct is not subject to a precise definition. PSR Addendum, ¶ 4. Perhaps there is no precise definition, but the standard itself is clear, and "Notes 4 and 5 should assist the court

in determining whether the application of this adjustment is warranted in a particular case."

§3C1.1 For this enhancement to apply, the Government must *prove* that Mr. Ismail

> willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct[.]

§3C1.1

The only thing the Government proved is that Mr. Ismail willfully obtained a passport by false statement.  Mr. Ismail admitted to that conduct.   That offense conduct may be suspect when considering the circumstances of the pending investigation at the time, such suspicion is not the same thing as a preponderance of the evidence. There is simply no evidence that Mr. Ismail was trying to flee the country to obstruct an investigation. Ismail's use of a passport obtained by false statement conviction alone cannot serve to meet the Government's burden of proof.

Even if one takes the inferential jump and concludes Mr. Ismail was fleeing to avoid arrest, that conduct is specifically excluded from being used for an obstruction of justice enhancement. *See* §3C1.1 Application n. 5(D) (avoiding or fleeing arrest is an example of conduct not covered by the obstruction of justice enhancement). In attempting to differentiate Mr. Ismail's conduct from the typical flee, probation labels Mr. Ismail's acts as "more aggravated" and less "impulsive" without explaining how those characterizations prove the enhancement should apply. It appears that probation's analysis is based on their subjective opinion that Mr. Ismail's conduct was worse than the typical fleeing case. Such

conclusory allegations fail to satisfy the Government's burden. The enhancement should not apply.

## II.   A GUIDELINE SENTENCE IS ILL FITTING TO MOHAHMED ISMAIL.

In *United States v. Booker*, 543 U.S. 220, 245-246 (2005), the United States Supreme Court ruled that mandating the federal sentencing guidelines is unconstitutional, and instead, these guidelines should serve as advisory. Post-*Booker* rulings from both the Supreme Court and the Eighth Circuit have clarified that district courts possess significant discretion in determining appropriate sentences. While the guidelines remain a consideration, they are now just one among many factors courts must weigh in accordance with §3553(a)'s principle of imposing a sentence that is sufficient but not overly punitive to fulfill statutory sentencing purposes. Following *Booker*, courts are empowered to deviate from the advisory guideline ranges to craft individualized sentences. *U.S. v. Maloney*, 466 F.3d 663, 668 (8th Cir. 2006). Rigidly applying the guidelines without considering a defendant's unique circumstances and other mitigating factors would now conflict with legislative intent. *United States v. Feemster*, 572 F.3d 455 (8th Cir. 2009).

Therefore, sentencing judges have great discretion and flexibility in considering § 3553 factors. These factors include the nature of the offense, the defendant's history and characteristics, and the need for the sentence to reflect the seriousness of the crime, promote respect for the law, provide just punishment, and serve broader purposes such as deterrence, public protection, and rehabilitation. *Booker* reinforced the importance of individualizing sentences based on these considerations, while still requiring courts to consult the

guidelines alongside available sentencing options, policy statements, the need to avoid disparities, and restitution for victims. By restoring discretion to the judiciary, *Booker* empowered courts to impose sentences that are fair, just, and appropriate to the unique circumstances of each case**.**

Upon consideration of these factors, the court then must impose a sentence that is sufficient, but no greater than necessary to satisfy the purposes of sentencing. The sentencing judge's responsibility, then, has become to "canvass all of the many features of the case that bear on the culpability of the defendant." *See United States v. Ovid*, 2010 W.L. 3940724, *1, 6 (E.D.N.Y). Some of these features have been considered by the Sentencing Commission, some have not. Nonetheless, this Court's consideration must be guided by the overarching explicitly stated command that the ultimate sentence to be imposed should be no greater than necessary to satisfy the statutory purposes of sentencing.

After consideration of each of the mitigating factors in this case, Mr. Ismail respectfully requests that this Court impose a term of imprisonment range of 24-36 months.

### A.  When assessing the need for the sentence imposed "loss amount" is a poor measurement to determine the criminal culpability of Mohamed Ismail.

The base offense level of 30, with 22 of those points being solely related to the loss neither reflects the nuanced realities of Mr. Ismail's gain nor the original intent of the Sentencing Commission. *See* PSR ¶ 103. As noted in *United States v. Lenagh* (2009 WL 296999, *1, 3-4, D. Neb.), the Commission did not apply its characteristic data-driven methods when establishing the ranges for white-collar theft crimes. Similarly, in *United*

*States v. Bennett* (2008 WL 2276940, *1, 4, D. Neb.), the court observed that the guideline ranges for these offenses were shaped more by policy than judicial trends.

As discussed in *The Limits of Federal Criminal Sentencing Policy; or, Confessions of Two Reformed Reformers* (9 Geo. Mason L. Rev. 1001, 1019 (2001)), what were once probationary offenses have been transformed into lengthy prison sentences. These changes were not grounded in the institutional practices of federal courts but were instead "essentially political decisions reflecting responses to interest group pressures." It is in just such circumstances that a prudent sentencing court may find that the guideline sentence is ripe for variance, because the guideline sentence is greater than necessary to achieve §3553(a)'s purposes.

Furthermore, there are significant reasons to challenge the application of the fraud guideline in this case, extending beyond the concerns related to its non-empirical foundation and historical evolution. As articulated in *United States v. Watt*, while loss is frequently utilized as a metric for assessing culpability, it does not consistently provide a precise or fair representation of the defendant's actual level of responsibility. *707 F. Supp. 2d 149, 155, (D. Mass. 2010)*. The court in *Watt* highlighted that loss can serve as a useful indicator, but it may fail to reflect the complete context of the offense, raising doubts about its validity as the sole measure of culpability in sentencing decisions.

For example, in *Lenagh*, where the victim's loss amounted to $1.4 million while the defendant received only $95,000, the court found that holding the defendant accountable for the entire loss inflated her culpability. *United States v. Lenagh*, 2009 WL 296999, *1

8

(D. Neb. 2009). $95,000 is 6.79% of 1.4 million dollars. Similarly, in Mr. Ismail's case, the total personal gain out of the $30,000,00 is $2,000,000, which is 7.33% of the $30,000,000 total. Because the victim's loss in this case is grossly disproportionate to the defendant's gain, relying on that $30,000,000 figure "overstate[s] both the degree of the [Mr. Ismail's] criminality and his need for correction." *See United States v. Costello*, 16 F. Supp. 2d 36, 38-39, (D. Mass. 1998), quoting *United States v. Stuart*, 22 F.3d 76, 82, (3rd Cir. 1994). And in this case that is exactly what happened. Mr. Ismail personally gained a small percentage of the loss, and his role was more limited.

Like the Court should do in this case, other courts have frequently rejected the guideline-recommended sentences in large-loss fraud cases, understanding that the application of these guidelines often leads to sentences that exceed what is necessary to fulfill the statutory purposes of sentencing. *See, e.g., United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) (condemning the "utter travesty of justice that sometimes results from the guidelines' fetish with absolute arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense" and imposing a sentence substantially below that provided by the guidelines); *United States v. Carter,* 538 F.3d 784 (7th Cir. 2008) (sentence of 24 months imposed in fraud case where guidelines called for 87-108 months); *United States v. Lupton*, 2009 WL 1886007, *1, 10 (E.D. Wis. 2009) (sentence of 24 months imposed in bribery and fraud case where guidelines called for 41-51 months). *See generally*, Vinegrad & Varner, *Non-Guideline Sentences for White Collar Defendants*, 242 <u>New York Law Journal</u>, 1 (10-14-09) (collecting cases).

Here, Mr. Ismail's base offense level severely overstates the gravity of his criminal conduct. Not only does it attribute to him a loss number which is far beyond what he received, it fails to account for the legitimate meals and food that he provided while participating in the program.  This Court should disregard that offense level and sentence Mr. Ismail consistent with his personal culpability.

### B.  The loss amount attributed to Mr. Ismail is incomplete.

The PSR sets Empire Cuisine and Market a loss amount at least $30,000,000. The PSR rests on evidence presented at trial, which was intended to *establish* fraudulent activity, not to precisely quantify the loss. The PSR's calculation fails to account for the legitimate goods and services provided by Empire Cuisine and Market. The loss should be reduced by "money returned, and the fair market value of the property returned, and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." USSG §2B1.1, comment. (n.3(E)(i)) (emphasis added); see also *United States. v. Campbell*, 765 F.3d 1291, 1305 (11th Cir. 2014) (although the court may be justified in treating all money transfers as loss when conduct is "permeated" with fraud, "value may be rendered even amid fraudulent conduct" and defendant appropriately received credit for such value (internal citation and punctuation omitted)); *United States v. Klein*, 543 F.3d 206, 214–15 (5th Cir. 2008) (district court erred by failing to offset loss to insurers by value of drugs that patients actually needed).  For losses involving government benefits, there is a special rule: "loss shall be considered not

less than the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be." *USSG §2B1.1, cmt.n.3(F)(ii).*

The PSR does not account for the value of the goods and services provided. Absent this essential calculation, the figure of $30,000,000 should not stand, as it represents conjecture rather than a preponderance of the evidence. Failure to credit such value may constitute reversible error. *See, e.g.,* United *States v. Alphas*, 785 F.3d 775, 784 (1st Cir. 2015) (remanding case to allow determination as to amounts, if any, that would have legitimately been paid for insurance claims that were artificially inflated but may have contained genuine claims; "void-for-fraud" clauses in insurance policy did not change analysis and "intended loss"). Accordingly, this loss amount is incomplete and blurs its efficacy for sentencing purposes.

### C. Applying the net gain attributed to Mohamed Ismail is a more wholistic and fair approach.

A more wholistic and fair approach to the application of the loss amount versus the broader calculation of the intended loss amount is to apply the net gain attributed to Mr. Ismail. By the government's own calculations without deduction for goods and services rendered Mohamed Ismail's portion of the net gain to Empire Cuisine and Market is $7,334,355.53. (*Doc 650 Dec. Lacramioara Blackwell pg. 10*). Further, the government's own calculations attribute a net gain to Mr. Ismail himself in the amount of $2,225,015.25. *Id. at pg. 11.* The net gain as calculated by the Government without reduction for goods or services provided creates a level 6 + 18 (More than $3,500,00.00 but less than $9,500,000.00) for a base offense level 24 for Mr. Ismails portion of the net gain to Empire

Cuisine and Market, LLC.  Applying the level 6 + 16 (More than $1,500,000.00 but less than $3,500,000.00) as the net gain to Mohamed Ismail himself results in base offense level of 22.  Prior to the Court's consideration of variances or departures and applying the guidelines calculations in the PSR that would place Mr. Ismail at either a 26 (24+2+2-2) (63-78 months) or a better reflection of his gain would be a 24 (22+2+2-2) (51-63 months).  Should the Court reject the 2-level obstruction of justice enhancement and grant a 2-level minor role reduction the guideline ranges before variances or departures would be 24 (24 +2-2) with Criminal History Category II (57-71 months) or a 22 (22+2-2) with Criminal History Category II (46-57 months).

**D.    The public faces no risk from Mr. Ismail and he needs no correctional treatment**

These factors require little ink to evaluate.  Mr. Ismail lived a crime free life for 49 years.  In fact, as noted below he has lived a remarkably prosocial life.  Mr. Ismail true character is further reflected in his good behavior over a span of 2 1/2 years both while in custody and on pretrial release.  *See Ltr Sherburne County Jail Captain Lisa Kachmarek* ("Ismail has shown and ability to take initiative and learn new things and adjust to his environment and make the most of his time here.  Feedback from staff has been very positive.").  Simply put Mr. Ismail will not be of any risk to the public and he has proven he does not need further correctional treatment.

**E.    A term of imprisonment of 24-36 months adequately reflects the seriousness of the offense under the totality of the circumstances including the 10 ½ months incarceration Ismails has served prior to sentencing and the additional time spent he spent on home confinement.**

An additional term of imprisonment of 24-36 months is sufficient but not greater than necessary to reflect the seriousness of the offense and to punish Mohamed Ismail for his role in this criminal act.  While punishment and deterrence are important factors the Court must not look at these through only the bars of a prison cell.   Punishment has been levied against Mr. Ismail in many ways and will continue for the rest of his life. Punishment has included substantial time in a local jail, home confinement and other significant restrictions on his freedom.  Punishment has meant and will mean the financial penalty paying back restitution for the rest of his life.  Punishment includes the loss of his family home, his American dream, that he worked diligently for half a lifetime to achieve. Punishment and deterrence must be weighed based on the individual characteristics of Mr. Ismail and the toll it exacts not only on himself but his family and surrounding community that relied upon him.  The easy route is to take all the sensationalized media and political football regarding the administration of the "Federal Child Nutrition Programs" as fodder to harshly punish Mr. Ismail.  Sentencing is not intended to be easy and the totality of the case facts and the unique experience of Mr. Ismail including his pre-sentencing incarceration and home detention act as significant punishment in the total calculus.

Undersigned counsel fears the Government will continue its ongoing attempt to lump Mr. Ismail into its narrative about the largest Co-vid 19 fraud scheme, attempts to bribe a juror, and so on.  Mr. Ismail had nothing to do with the attempted bribery of a juror. Mr. Ismail exercised his constitutional right to a jury trial and is not receiving a 3-point reduction.   Any attempt by the Government to imply that Mr. Ismail should be punished

13

more harshly because has not accepted responsibility must be rejected.  In fact, that implication flies in the face of his continued rights to appeal his conviction and ultimate sentence.  Further, any attempt by the Government to attempt to shoehorn the conduct of other defendants or the broader narrative about the "Feeding our Future" fraud scheme must be rejected.

**F.      Mr. Ismail personal history and characteristics are remarkable and tell a very different tale than that as a defendant in this case.**

Mr. Ismail's life is a testament to resilience and perseverance in the face of immense adversity.  Born in Somalia in 1973, Mr. Ismail's early years were marked by hardship. P.S.R. at pg.29-31. Mr. Ismail's father, Jama Ismail Gele, was a handyman, and his mother, Hasna Nor Mohamud, cared for Mr. Ismail and his eight siblings in their home. *Id.* The family lived in a modest mud house with three small bedrooms and an outdoor bathroom. *Id.* With no electricity, they relied on gas-lit lanterns and a tarp to cover their mostly-open roof when it rained.  *Id.*  A small well in the kitchen provided water, but the family frequently faced food insecurity.  *Id.* Mr. Ismail vividly recalls days when he would only have a single piece of bread to eat. *Id.*

Growing up in Somalia was challenging. Mr. Ismail's father struggled to find consistent work due to the tribalism that permeated the country, often leading to discrimination against their minority tribe. *Id.* To ease the burden on his family, Mr. Ismail began working at a local garage as a teenager, earning just enough to pay for his own food.

*Id.* Despite these hardships, he remained determined to support his family and make the best of his circumstances.

The 1980s brought increased instability to Somalia, as opposition to the military government grew. *Id* at ¶ 128. By 1991, the country was plunged into civil war, and the government was overthrown, leaving a power vacuum that led to widespread violence. *Id.* Mr. Ismail, just eighteen years old at the time, was at a market when an armed militia began approaching his neighborhood. *Id.* As news spread that the militia was killing people indiscriminately, Mr. Ismail fled with a group of strangers toward the Kenyan border. *Id.* Their journey was treacherous, covering more than 300 miles. Initially traveling by car, the deteriorating roads eventually forced them to continue by foot until they reached the refugee camp in Liboi, Kenya. *Id.*



The Liboi refugee camp, where Mr. Ismail would spend the next two years, was far from a safe haven. The camp was overcrowded and plagued with food and water shortages, and the water that was available was often contaminated. *Id* at ¶ 129. Waste management was virtually nonexistent, leading to unsanitary conditions that made disease rampant. *Id.*

Mr. Ismail, with his slight frame, was mistaken for a minor by camp officials and accused of trying to secure extra food rations for a non-existent family. *Id.*

During his time in the camp, Mr. Ismail contracted hepatitis, which further weakened his already fragile body. *Id.* He was confined to a specific area of the camp until he was eventually taken to a Doctors Without Borders hospital for treatment. *Id.* After recovering from hepatitis, he was placed in a boarding school for teenagers who had been separated from their families. *Id.* However, this new environment presented its own challenges, including abuse and bullying. *Id.* Mr. Ismail contracted tuberculosis while at the school, requiring several months of hospitalization. *Id.*



After his recovery, Mr. Ismail decided to leave the refugee camp and move to Nairobi, Kenya, in search of work. *Id.* He found a job at a restaurant and saved enough money to rent a small apartment. *Id* at ¶ 130. Determined to reconnect with his family, Mr.

Ismail used a local radio station to broadcast a message seeking information about their whereabouts. *Id.* To his immense relief, he learned that his family had also escaped Somalia and were staying at the same refugee camp in Liboi. *Id.*

In Nairobi, Mr. Ismail began to build a life for himself. *Id* at ¶ 130. While working at a store, he was introduced to Ayan Yusef, a Somali woman living in Minnesota who had connections in Kenya. *Id.* Ayan sponsored Mr. Ismail to immigrate to the United States, and in September 1999, he arrived in Minnesota. *Id.* Mr. Ismail and Ayan married, but their union lasted only two years. *Id.* After their divorce, Mr. Ismail met Deqa Yusuf, whom he married in a traditional ceremony in 2003. *Id* at ¶ 131. Together, they built a life and a family, raising five children in Minnesota. *Id.* In 2005, Mr. Ismail became a naturalized United States citizen, a milestone that marked a new chapter in his journey. *Id* at ¶ 136.

Proud to have escaped the horrors of war and to be living in the United States, Mr. Ismail embraced hard work from the moment he arrived. He began by working as a janitor, then moved on to a job at a parking garage, before becoming a full-time machine operator at Polar Semiconductor, Inc. *Id.* at ¶150. For eighteen years, he demonstrated his dedication and reliability at this same company. In 2018, while still employed at Polar Semiconductor, Mr. Ismail pursued his entrepreneurial ambitions, starting a gas station business, which he later expanded into a grocery store. *Id* at ¶ 148-149

Mr. Ibrahim Mohamad, Executive Director of the Community Resource, highlighted the profound impact this store had on the community:

> I have known [Mr. Ismail] since 2018. [Mr. Ismail] was a great person, active in the community. He was [a] business entrepreneur. He created Halal meat

17

> grocery store in Shakopee where community members could get their traditional meals, food, and meat. Here in Shakopee before he opened his store, Halal meat lovers used to drive 20 miles to Minneapolis, and Saint Paul [,] but now they are enjoying the store being in Shakopee and the commute is much better.

(Letter from Ibrahim Mohamad).

Despite the stability he found in the United States, Mr. Ismail never forgot his roots. In 2018, he encouraged his wife and children to relocate to Kenya, hoping the climate would alleviate his daughter Ilhan's severe asthma and provide his children with a connection to their heritage. *Id* at ¶ 132. He regularly visited them in Kenya, but his life took a difficult turn when he was arrested on charges related to his passport. *Id.* This arrest prevented him from visiting his family during Ramadan in 2022, causing great distress to his children, who had been eagerly awaiting his arrival. *Id* at ¶ 135.

Deqa Yusuf, in a heartfelt letter, described Mohamed as the backbone of their family. His unwavering love and commitment as a husband and father have been the foundation of their family's happiness. She recounted how Mohamed embraced the responsibility of raising their five children, ensuring they had everything they needed—education, guidance, and the values of hard work, integrity, and compassion. His influence, she emphasized, has been profound, helping their children grow into responsible, caring individuals. Deqa humbly asked the court to consider Mohamed's positive impact on their family and community when determining his sentence, expressing confidence that he would continue to contribute meaningfully if granted leniency. Letter from Deqa Yusef, Dated September 4, 2024.

Mr. Ismail's son, Mustaf Ismail, echoed his mother's sentiments in his own letter. Mustaf highlighted the core values his father instilled in him—honesty, hard work, and empathy—values that have guided him to become a responsible and contributing member of society. Mustaf described his father as a mentor and role model not only to him but also to many others in their community. He requested the court's consideration for a reduced sentence, emphasizing his father's exemplary character and the potential for continued positive influence if given the opportunity. Letter from Mustaf Ismail.

In his letter to the court, Mr. Ismail's son, Muhsin Ismail, respectfully requests leniency for his father. Muhsin highlights the strong values his father has instilled in him, such as honesty, hard work, and empathy, which have shaped him into a responsible and contributing member of society. He emphasizes that his father's influence extends beyond their immediate family, as Mohamed has served as a mentor, role model, and reliable figure to many within the community. Muhsin underscores his father's commitment to charitable work and community service, and he believes that a reduced sentence would allow Mohamed to continue making a positive impact on their family and the community. Muhsin asks the court to consider his father's exemplary character and the potential for continued contributions if granted leniency.

Ilhan Ismail, Mr. Ismail's daughter, also appealed to the court's sense of understanding and leniency. She portrayed her father as the backbone of their family, always present to guide and support them. Ilhan emphasized the values of hard work, integrity, and compassion that her father had instilled in her and her siblings. She

respectfully asked the court to consider her father's role as a dedicated father, husband, and community member when deciding his sentence. Letter from Ilhan Ismail, Dated September 13, 2024.

Beyond his immediate family, Mr. Ismail has made a significant impact on those around him. Farhia Mohamed Hersi, in a letter of support, described Mr. Ismail as a man of quality and dignity, someone who brought hope and relief to her family. Farhia recounted how Mr. Ismail had been a parental figure to her family, always bringing them happiness and joy. His role as a mentor and role model inspired Farhia to become a better person, a testament to the profound influence Mr. Ismail has had on those who know him. Letter from Farhia Mohamed Hersi, Dated August 4, 2024.

Similarly, Mohmud Haguf, who has known Mr. Ismail for seven years, praised his humility, community orientation, and good moral character. Mohmud described Mr. Ismail as personable, well-liked, and compassionate, someone who consistently lent a hand to those in need. He emphasized Mr. Ismail's contributions to the Somali community in Minnesota, portraying him as a valued and effective member of their community. Letter from Mohmud Haguf, Dated July 29, 2024.

The overwhelming community support Mr. Ismail has received since being charged is similar to the defendant in *Gall*, where the court noted that there was a "small flood" of letters from many of his family and friends "uniformly praising his character and work ethic." *Gall v. U.S.*, 552 U.S. 38, 43 (2007). Like in *Gall*, all the letters from Mr. Ismail's community uniformly praise his character and work ethic. *Gall*, 552 U.S at 43.

Mr. Ismail persevered despite the hardships he faced. His life is a testament to the power of resilience and the strength of the human spirit. Mr. Ismail's story, from his early years in Somalia to his life in the United States, is one of determination, survival, and the unwavering pursuit of a better life for himself and his family. It would be a disservice for the Court to overlook the value Mr. Ismail brought to his family and community. Mr. Ismail respectfully requests this Court give Mr. Ismail's personal characteristics and history great weight in sentencing him outside of the guideline range.

### G.   Mohamed Ismail moves for a departure pursuant to U.S.S.G §5K2.23 and §5G1.3 fn. 5 for the Seven Months he served in the Sherburne County Jail on the now discharged sentence for obtaining a passport by false statement. In the alternative Ismail moves for a variance for the seven months served.

Mr. Ismail moves for a departure for the seven months he served in custody on the now discharged term of imprisonment for obtaining a passport by false statement offense.

Pursuant to §5K2.23,

A downward departure may be appropriate if the defendant (1) has completed serving a term of imprisonment; and (2) subsection (b) of §5G1.3 (Imposition of a Sentence on a Defendant Subject to Undischarged Term of Imprisonment or Anticipated Term of Imprisonment) would have provided an adjustment had that completed term of imprisonment been undischarged at the time of sentencing for the instant offense. Any such departure should be fashioned to achieve a reasonable punishment for the instant offense.

§5G1.3 provides for an adjustment if a defendant is convicted of relevant conduct and the sentence is not discharged at the time the new sentence is imposed.

In the alternative, should the Court not find that the guideline departure provision applies than Mr. Ismail moves the Court to vary downward in her sentence to account for the time Mr. Ismail served on the obtaining a passport by false statement offense.

**a. Mohamed Ismail should also receive a hard-time variance for the time that he has served in the Sherburne County jail.**

Mohamed Ismail moves the court for a hard-time variance to account for the fact that conditions in the Sherburne County jail are spartan in comparison to the prison where Mr. Ismail would likely serve his sentence.  See *United States v. Fiorito*, No. 07-CR-0212(1) (PJS/JSM), 2010 WL 1507645, at *39 (D. Minn. Apr. 14, 2010); *United States v. Edmonds*, 920 F.3d 1212, 1214 (8th Cir. 2019) (district court reduced prison time for "hard time" served pretrial); *Untied States v. Thomas*, No. 07-297(9) (DWF/JSM), 2012 WL 12896383, *1 (D. Minn. Nov. 12, 2012) (district court granted downward variance for defendant's pretrial custody at Sherburne County Jail).

In a Star Tribune article, jails were found to be far more difficult to survive than prisons. The article explains that jails are used for short-term stays pending trial or sentencing while prisons are designed for long-term stays and offer programming and treatment. *Andy Mannix, Minnesota Prisoners Decry Aimless Limbo in County Jails, STAR TRIBUNE, Mar. 13, 2016 (available at* http://m.startribune.com/state-s-prisoners-decry-aimless-limbo-in-county-jails/371865301*)*.

Mr. Ismail's term of detention of 10 ½ months broken into two stints of 7 months and 3 1/2 months prior to sentencing at the Sherburne County jail should be considered to vary from the guideline sentence. This is because time spent in Sherburne County is spent

mostly in a cell. The day in a life of a prisoner at Sherburne County jail is not comparable to the day in the life of a prisoner at a Bureau of Prison facility.

## **CONCLUSION**

Based on the foregoing, Mohamed Ismail respectfully asks this court to sentence him to him to a range of 24-36 months imprisonment.

Respectfully submitted,

Dated:   October 2, 2024                    */s/ Patrick L. Cotter*
                                           Patrick L. Cotter
                                           Attorney No. 0319120
                                           Attorney for Defendant
                                           105 Hardman Court, Suite 110
                                           South St. Paul, MN 55075
                                           Phone: 651-455-1555
                                           Fax: 651-455-9055
                                           patrick@siebencotterlaw.com